1999-NMCA-017

974 P.2d 173

Adelmo QUINTANA and Clovis Quintana,
Plaintiffs–Appellants,

v.

Jose L. BACA, et al., Defendants,

and

Celsa Quintana Lara, Defendant–
Appellee.

No. 18886.

Court of Appeals of New Mexico.

Nov. 23, 1998.

Eliu E. Romero, Taos, for Appellants.

Jane Bloom Yohalem, Santa Fe, for Appellee.

## OPINION

BOSSON, J.

{1} In this appeal we interpret laws passed by our state Legislature during the Great Depression over a half century ago to help impoverished land owners reclaim land lost to the state because of nonpayment of taxes. As we shall see, these taxpayer-relief laws were not promulgated in one stroke; they evolved over a period of years, as the Legislature experimented with different ways of affording relief to taxpayers whose land passed to the state. The dispute before us arises from the natural confusion created by such legislative experimentation, compounded by the passage of time. For the reasons that follow, we reverse the decision of the district court.

## BACKGROUND

{2} The principal facts are not in dispute, and they were largely stipulated to below. In 1936 Jose Quintana received from his mother a small tract of land located in Taos County as his sole and separate property. Because the property taxes had not been paid, in 1937 the County Treasurer issued a Tax Sales Certificate to the state for nonpayment of taxes. After expiration of the statutory two-year period for taxpayer redemption, the County Treasurer issued a tax deed to the state in 1940 for the Quintana land. However, the state never put the land to public sale, and by 1949 Jose Quintana applied to the state to repurchase his land. In that same year, he received a deed from the

State Tax Commission, in exchange for satisfying the outstanding tax bill of $15.98.

{3} The deed from the state was made out in Jose Quintana's name alone. Although Jose Quintana had married by then, both he and his wife regarded the land as his separate property. Years later in 1978, Jose Quintana deeded this same land to his two sons who are the Plaintiffs here. That deed bore only Jose Quintana's signature as grantor. Defendant Lara, one of Jose Quintana's daughters and sister to the Quintana Plaintiffs, challenges that deed in this litigation. She contends that the land became community property at the time it was conveyed by the state because her parents were then married, and therefore, she claims the deed to her brothers was ineffective without her mother's signature. If Lara is correct that the land became community property and the deed from her father to her brothers is void, then as a Quintana heir she has a claim to an undivided fractional interest in that land. If Lara is not correct, and Jose Quintana received this land from the state as his separate property, then the deed to his sons is effective, and Lara takes nothing in this proceeding.

## DISCUSSION

{4} We note initially the familiar presumption that property acquired during marriage is community property. *See* NMSA 1978, § 40-3-12(A) (1973). When Jose Quintana received the deed in his name from the state in 1949, there was a community, and unless this presumption can be set aside, we would be compelled to conclude that Jose Quintana acquired the land from the state as community property. We also acknowledge legal authorities such as *Alamogordo Improvement Co. v. Hennessee*, 40 N.M. 162, 56 P.2d 1127 (1936), which hold that when a taxpayer is unable to redeem and the state sells the land for back taxes at public auction, the title conveyed by the state to the third-party purchaser "is a new and paramount title in fee simple absolute ... striking down all previous titles and interest in the property." *Id.* at 165, 56 P.2d at 1129. In *Alamogordo Improvement Co.*, a tax deed from the state was held to supersede restrictive covenants that had been part of the original deed,

in that case prohibiting the sale of liquor on the premises, and the tax deed thereby created a new title in the grantor. *Id.* Relying on *Alamogordo Improvement Co.*, the district court in the case before us held that Jose Quintana received a new title in 1949 measured by his marital status at that time. Thus, title was transmuted to community property, and the district court held that Jose Quintana's deed to his sons, bearing his signature alone, was void.

{5} In rebuttal, Jose Quintana cites to laws in effect during this era that gave the original owner preferential rights to repurchase land from the state and which restored the title to its status as of the time of forfeiture, not as of the time of repurchase. We turn, then, to the relevant laws of the time which governed how owners lost and reacquired land from the state by payment of outstanding taxes.

{6} Both parties begin with 1934 N.M. Laws, ch. 27, providing in its title for the "Redemption of Property Sold for Delinquent Taxes, and the Disposition of Property Not Redeemed." This is the law in effect in 1937, when the County Treasurer executed the Tax Sales Certificate to the state for Jose Quintana's land. As Lara correctly observes, under this law in its original form, the delinquent owner was given two years in which to satisfy the back taxes and redeem the property. *See* 1934 N.M. Laws, ch. 27, § 17. At the end of two years, once the tax deed went to the state, the owner had no further rights of redemption or other preferential purchase; he could only hope to buy the land at auction the same as any other member of the public. *See* 1934 N.M. Laws, ch. 27, § 30. Lara relies on 1934 N.M. Laws, ch. 27 in its original form, and she characterizes her father's purchase from the state in 1949 as creating a new title, the same as a sale to the public, which under *Alamogordo Improvement Co.* would be measured by his marital status at the time of the conveyance.

{7} However, the Laws of 1934 did not remain static. Frequent amendments, first in 1937, *see* 1937 N.M. Laws, ch. 215, followed by a major amendment in 1939, *see* 1939 N.M. Laws, ch. 203, and even thereafter, added new provisions designed to miti-

gate the harsh consequences of the times. We focus on the 1939 N.M. Laws, ch. 203 entitled "An Act Providing a Method of Disposition of Lands Acquired by the State by Tax Deeds," which expressly amended certain portions of the 1934 N.M. Laws, ch. 27, deleted others, and added new ones. 1939 N.M. Laws, ch. 203, § 4 created preferential rights of repurchase in the former owner where none had previously existed, even though the period of redemption had expired. That section stated:

> The person whose title to property has been extinguished by the issuance of a tax deed to the state shall have the first and prior right to repurchase such property, provided that application for such repurchase is received by the State Tax Commission before any other application to purchase such property is received and accepted by said Commission.

1939 N.M. Laws, ch. 203, § 4. Taxpayer repurchase was to be at a cost of no more than the delinquent taxes, plus interest and penalties, or the appraised value of the property, whichever was less. *See id.* This same language was later incorporated into the codified laws of 1941, *see* NMSA 1941, § 76–740, and that section, with only minor amendments, was in effect in 1949 when Jose Quintana made application to the state to repurchase his land.

{8} The 1939 amendments differentiated between an application to *repurchase,* which was available only to former owners like Jose Quintana, and an application to *purchase* which was open to any member of the public when the original owner did not appear to repurchase. *Cf.* 1939 N.M. Laws, ch. 203, §§ 4, 5. In 1949, when the State Tax Commission deeded this land to Jose Quintana, it was responding to just such an application to *repurchase,* and the Commission executed its deed to Jose Quintana by virtue of the only legal authority then in effect: the same 1941 Code, as amended, including Section 76–740. By 1949, the original 1934 N.M. Laws, ch. 27, on which Lara relies so heavily, was no longer the law; it had been amended frequently to include the very preferential rights of repurchase that Jose Quintana invoked in this case.

{9} The next question is whether under preferential rights of repurchase the status of the property is measured as of the time of conveyance from the state, as in *Alamogordo Improvement Co.,* or as of the time the property was lost to the state for back taxes like a redemption. Fortunately, we do not have to look far for judicial interpretation. In a remarkably similar case to Jose Quintana's position here, the Supreme Court held in *Langhurst v. Langhurst,* 49 N.M. 329, 330, 164 P.2d 204, 205 (1945), that a preferential right of repurchase under this very statute, Section 76–740, was the functional equivalent of a redemption, in which the state returned the property to its former owner in the same, separate-property status as had existed at the time of forfeiture. Like Jose Quintana, the husband in *Langhurst* had originally received title as a single man, then he lost it to the state for nonpayment of taxes, and eventually he repurchased as a married man under these same statutes. The husband's widow claimed a community property interest under the theory that a deed of repurchase from the state created a "new and independent title," and thereby transmuted title from separate property to community property. *Langhurst,* 49 N.M. at 332, 164 P.2d at 205–06. The Supreme Court disagreed, holding that:

> In neither case [redemption or repurchase] is the sale of the taxed property nor the subsequent proceedings a final and irrevocable divestiture of the title of the owner, or former owner, so long as the privilege of recapture extended to such owner, or former owner, may be lawfully exercised.

*Id.* at 330, 164 P.2d at 205. The Court concluded that: "As between redemption before deed is issued to the state and repurchase afterwards the result, so far as the person whose title has been extinguished is concerned, is the same. The mechanics only, are different." *Id.* at 330–31, 164 P.2d at 205. Thus, the land remained husband's separate property without any transmutation.

{10} *Langhurst* is persuasive authority. It followed *Yates v. Hawkins,* 46 N.M. 249, 256, 126 P.2d 476, 480 (1942), which held that the rights inuring to the repurchaser were subject to change by the Legislature and

could be decreased between the time of forfeiture and the time of repurchase without violating an owner's rights to due process of law. Under *Yates,* the right of repurchase was not immutable as of the time the property was forfeited; it was capable of legislative redefinition to be measured as of the time the owner exercised the right of repurchase. *Id.* This is what occurred to Jose Quintana: losing his land in 1937 under the Laws of 1934 as originally promulgated, and then repurchasing under a preferential status that had not even existed twelve years before.

{11} *Langhurst* has been cited often in New Mexico case law. *See, e.g., Velasquez v. Mascarenas,* 71 N.M. 133, 139, 376 P.2d 311, 315 (1962) ("[T]he redemption and payment of the taxes restores the title of the property to its status prior to the tax sale."); *Sanchez v. New Mexico State Tax Comm'n,* 51 N.M. 154, 156, 180 P.2d 246, 247 (1947) (same). Interestingly, in *Sanchez* the owner advanced the same argument as Lara does here to rid his title of liens resulting from prior debts. He argued that his repurchase from the state under Section 76-740 for back taxes gave him an entirely new title freed from prior liens. *See id.* The owner lost, and the *Sanchez* court reiterated that the right of repurchase under these same laws simply restored to the former owner the same title that had been held previously, which in this case was the title to the Sanchez land burdened by the same debts. *See id.* To have held any differently, the court in *Sanchez* would have allowed owners to work a fraud on their creditors by not paying taxes, losing title to the state, and then repurchasing under a statutory preference free from debt.

{12} Based on these authorities, it would appear that the district court erred when it decided that Jose Quintana's repurchase from the state in 1949 conveyed title to him as community property. Our only reservation in deciding for Jose Quintana is a matter of preservation below. It would have been preferable if Jose Quintana had cited to the district court the specific statutory and decisional authorities on which he now relies for reversal, and we believe that omission might have made a difference below and avoided the need for this appeal. However, Lara did not raise any such objection in her answer brief, and the district court was advised of the general theory discussed herein. *Cf. Garcia v. LaFarge,* 119 N.M. 532, 540, 893 P.2d 428, 436 (1995) (argument adequately preserved below even though citation to significant authority was not made to district court); *Albertson v. State,* 89 N.M. 499, 501, 554 P.2d 661, 663 (1976) (general evidentiary objection adequate although citation to specific evidentiary rule omitted). We exercise our discretion to dispose of this dispute on its merits. We also note our impression that both parties share the responsibility for any error committed in interpreting laws so long retired to history.

## CONCLUSION

{13} Accordingly, we hold that when Jose Quintana exercised his statutory rights of preferential repurchase in 1949, he redeemed the land as his separate property just as he held it in 1937. Thereafter, Jose Quintana had the right to deed his separate property by his signature alone. Lara's attempt to vitiate the deed as a defective transfer of community property is without merit. The district court having ruled to the contrary, its judgment is hereby reversed, and the case is remanded for whatever further proceedings may be necessary not inconsistent with this opinion.

{14} The parties will bear their own costs on appeal.

{15} **IT IS SO ORDERED.**

PICKARD and WECHSLER, JJ., concur.